Cbeel, P. J.
(dissenting). There is dissent as to only one of the questions herein raised, namely, does the evidence here presented, admittedly circumstantial, sufficiently establish that the defendant was the driver of the automobile in question. We are unanimously agreed as to the other and more difficult problem herein: as to the propriety of the police patrolman’s action in interrogating, investigating and briefly detaining the defendant, which action produced one of the more cogent bits of circumstantial evidence as to the defendant’s driving the automobile. It has been strongly urged by defense counsel that such acts of the patrolman violated the defendant’s constitutionally protected rights of privacy (Mapp v. Ohio 367 U. S. 643). While we are in agreement, there is generally such uncertainty and diversity among the members of the Bench and Bar, that I have thought it well to write of this problem at some length in the hope of directing attention to the need of clarification. The facts of this case most clearly present this problem.
The evidence established that at 2:30 a.m. on October 17,1962, a police officer on radio patrol duty in the County of New York came upon an apparent accident. A car was mounted over the sidewalk, the rear of which was “ pushed back into a building ”. The front end of the car was smashed in. The lamppost across the street, West 18th Street, had been knocked over. The car was smoking to such an extent that the first act of the patrolman was to radio a call to the Fire Department. The motor of the car was still running, but could not be turned off since no key was in the ignition — which facts would strongly suggest to this experienced police officer the probability of a joy ride car theft. No one was at the scene, or in sight upon the street.
Upon the front seat of the said car, and on the driver’s side the patrolman found a brown button and on the passenger’s side of the front seat he found a fountain pen.
The police officer in his patrol car made a quick patrol of the area, and on 18th Street at 7th Avenue, slightly less than a block *671 away, he came upon the defendant seated on the step at the subway entrance. The patrolman questioned the defendant who denied any and all connection with the accident and with the automobile involved. The patrolman noticed that a button was missing from the left coat sleeve of defendant. He laid hold of the defendant’s arm and compared the button found upon the driver’s side of car and found that button to match in color, size, form and texture, the buttons remaining upon the defendant’s coat sleeve. The patrolman took the defendant back to the scene of the accident, and soon thereafter to the station house for further' interrogation. This was done in the total absence of warrants for search or for arrest.
The arrest, in the manner provided for by section 177 of the Code of Criminal Procedure, was made at the station house, where the defendant was advised that he was under arrest, and of the charges for which he was arrested. The defendant was then searched and there was taken from his person, the registration for the car involved in the accident, namely license registration 5T6176 N. Y., a key wallet with keys which later were found to unlock the trunk and glove compartment of the said car, and an insurance policy indorsement for the said car. There was also found a Motor Vehicle Bureau learner’s permit of very recent issue. The defendant admitted the learner’s permit and the fountain pen were his.
Prior to the trial, a motion to suppress had been duly made and denied, and that holding is the law of this case. But upon the representation that this preliminary motion had not resolved the question as to the invasion of privacy of the defendant, by the officer’s acts in comparing the found button with those upon the defendant’s coat sleeve, the defendant’s attorney was permitted to renew his motion to suppress all testimony relating to that circumstance, and decision thereon was reserved.
The owner of the automobile in question testified that she had given the defendant permission to use and drive her car, the registration, the keys and the insurance policy indorsement relating to the car. She further testified that the defendant had acknowledged his financial responsibility for the damage to the car and had paid her the full value of the car when it was found to be a total loss. However, she quickly withdrew and changed her testimony that the defendant had admitted driving the car at the time of the accident.
The defendant called no witnesses and rested at the conclusion of the People’s case. The uncontroverted evidence in the record amply establishes that the defendant was not a licensed driver, that he did not report the accident and that he was intoxicated, *672 but does the evidence, entirely circumstantial, sufficiently establish that the defendant was the driver of the car at the time of the accident % Our divergence of opinion as to whether the defendant was driving the car at the time of the accident is in no small measure contributed to and compounded by uncertainty as to the propriety and legality, under the Mapp decision, of the investigation and comparison by the patrolman of the brown button found by him on the driver’s side of the front seat with the buttons remaining on the coat sleeve of the defendant’s coat. It is strongly contended by defense counsel that this prearrest investigation and brief detention of the defendant by the patrolman was an invasion of the constitutionally protected rights of this defendant, and that all evidence of this circumstance must be excluded as “ poison ”, citing the language of Federal cases.
Thus there is raised again the question which has almost daily plagued criminal courts since the Mapp decision, namely, the propriety of patrol and crime prevention prearrest police activity. The Mapp decision mandates the exclusion of all evidence obtained by improper police activity, but gives no guideposts or even clues as to what are and what are not improper police methods.
That there is great uncertainty as to just which police practices are proper and which are unreasonable under the Fourth Amendment is fully recognized by the members of the Supreme Court. Justice Black has remarked: “ in no other field has the law’s uncertainty been more clearly manifested ”. (United States v. Rabinowitz, 339 U. S. 56, 67 [1950].) And Justice Clark has stated: “ it is the duty of this Court to lay down those rules [for the police and the citizenry] with such clarity and understanding that he [an officer and the citizens] may be able to follow them. For some years now the field has been muddy, but today the Court makes it a quagmire ” (Chapman v. United States, 365 U. S. 610, 622 [1961]). And in even stronger language Justice Clark has stated: “it is disasterous — to leave at large the inconsistant rules laid down in these cases. It turns the well springs of democracy — law and order — into a slough of frustration. It turns crime detection into a game of ‘ cops and robbers ’. We hear much these days of an increasing crime rate and a breakdown of law enforcement. Some place the blame on police officers. I say there are others who must shoulder their part of the responsibility”. (Chapman v. United States, 365 U. S. 610, 623, supra [1961].) That the Justice was referring to his brethren upon the Bench is made amply clear not only by his strong language but by their own holdings — in the last two decades in the 37 Supreme Court decisions considering the law *673 of search and seizure, in every one but one, the Justices have disagreed as to just what the police should have done, and in none have they laid down the ground rules as to just what a police officer on crime prevention patrol duty may properly do.
So great is this judicial confusion that one emeritus scholar of the law has suggested ‘‘ that the Supreme Court is not competent to make the rules (as to proper police practices) which it thus (Mapp, supra) attempts to enforce ” and further suggests that only legislation at the State level can hope to restore workable order. (John Barker Waite, Emeritus Professor of Law at the University of Michigan writing in 48 American Bar Assn. J., 1057, Nov., 1962.) Our judicial process does, indeed, have its limitations, but it should not be forgotten that one of the glories of our common law has been its ability to adjust and correct its thinking, to correct judicial error and misconception — and to conform the ancient concepts of the law to the reality of the times. The judiciary has long performed its part of the tremendous task it shares with legislatures of keeping the law in touch with ever-changing reality.
Can it be seriously doubted that legislative and judicial co-operation can lay down and apply a clear readily understood set of ground rules as to what are the rights and duties of citizens and police regarding crime prevention patrol, and which police practices and methods are reasonable and which unreasonable ? By such co-operative effort of the judiciary and Legislature, the Second Amendment to the Constitution, providing that “ the right of the citizenry to bear arms shall not be abridged ’ ’ has been so interpreted and applied (as to arms capable of concealment upon the person, and in metropolitan areas whose prevailing conditions presented urgent needs) so as to permit a disarmed citizenry and an armed police. If the joint efforts of the judiciary and legislatures has permitted one provision of the basic law to grow and mature to modern needs, may not they also succeed in clarifying this ‘ ‘ slough of frustration ’ ’ of the Fourth Amendment to meet the needs of the metropolis of today and of the megolopolis of the foreseeable future?
Any such legislation would be but a clarifying declaration of long-established practices under the common law. Since the first establishment of police departments in the midnineteenth century, law-enforcement officials have had and exercised a common-law right to certain minimal prearrest activity, to investigate, interrogate and briefly detain those found in crime suspected situations. Such crime prevention activity was one of the very purposes which called into being modern metropolitan police forces. So very generally was this common-law right exercised *674 and recognized in practice that there was little or' no occasion to comment upon it in reported cases, until it Began to Be called into question and challenged by those of the judiciary who were alarmed at the occasional officious, offensive abuse to which such right was susceptible. Because no adequate legislation was forthcoming to provide regulatory remedies tó counterbalance such abuses of this police right, jurists began to expand and extend the judicial remedy of excluding all evidence secured as' the result of such offensive police conduct, and to reverse convictions based in any way upon such evidence. The Mapp decision is the most recent extension of this judicial remedy.
Since the root cause of the problem is the occasional offensive abuse of police authority, just what is the most effective method of dealing with and eliminating such improper police methods? Is not this problem of such grave importance to each and every community which has an organized police force, that it should be dealt with by the most effective means available to improve, discipline and punish the officious offender ?
Is the judicial remedy of excluding all evidence produced by offensive police activity the most effective means’ of remedying police abuse? Justices of the Supreme Court have long recognized that this judicial remedy of exclusion is not too articulate or effective a means of getting at the abuse or the offending police officer. Justice Jackson has stated: 1 ‘ that the rtile of exclusion ahd reversal results in the escape of guilty persons is more capable of demonstration than that it deters invasión of rights by police. * * * The disciplinary or educational value of the courts releasing the defendant for police misbehavior is so indirect as to be no more than a mild deterrent at best ”. It does not shape the conduct of local police one whit. (Irvine v. California, 347 U. S. 128,136-137 [1954].)
Cannot the problem of improper police methods be dealt with more effectually, precisely, articulately and correctively by legislation, aimed at disciplining the offending officious policeman? Should not offensive abuse of police authority be moré precisely defined, as what it is in fact — a crime, or at least an offense; and should not a citizen’s violent resistance and opposition to reasonable police interrogation and inquiry likewise be more preóisely be so defined? In the proposed uniform arrest statute's a substantial start has been made by some States. But may not the problems Of a proper arrest statute be best tailored by local legislatures to meet the peculiar needs of the particular area? The problem of drafting proper arrest statutes is a difficult one requiring a most delicate balancing between the right of individual citizens to liberty and privacy, and the right of the *675 citizenry collectively to law and order. But cannot this difficult task, in the first instance at least, be more expeditiously, articulately, and precisely be performed by the Legislature rather than the judicial branch of government?
New arrest statutes clarifying the general rules as to the rights and duties of police and citizen in prearrest crime prevention patrol, while much needed in metropolitan areas, will probably be both unneeded and inappropriate in many vast areas of this Federal union. In many areas, the rural even wilderness frontier flavor of society most fortunately still prevails. It is in those less fortunate areas, which have developed great concentrations of population, some exceeding 100,000 citizens to the square mile, that such legislation is indicated to meet the peculiar conditions which such amassings of population generate. The City of New York has requested the State Legislature to enact legislation in the current session. The judiciary in considering such legislation would do well to exercise great restraint and consideration for those conditions which necessitate such legislation. And is not judicial restraint indicated, in all good grace, as local legislatures may strive to extricate the citizenry of metropolitan areas from this judicially created “quagmire ”. But should the judiciary not so restrain itself and strike down as unconstitutional such local statutes tailored to the needs of the community, may it most politely but most bluntly be suggested that such action would be no more nor less than a deliberate destruction of the delicate balance between State and Federal powers which has long been a glory of our Constitution and for which the Constitution provides a very explicit, most drastic and seldom used remedy. Our Constitution is an end product of a BidVOLUTION; a revolution against a tyrant, and may not there be not only executive and legislative, but also judicial tyrants ? A public servant whatever his rank is entitled to reverence, honor, or respect only so long as he renders service to those he is sworn to serve; but when he interposes his own predilections, wishes and will over and against the apparent common good, and the needs of the citizenry, has he not trespassed upon his oath and has he not become a tyrant of sorts? And if there be those who cry treason and/or contempt may they profit from an exemplary sympathetic understanding of the “ quagmire ” in crime prevention and law enforcement that has been created in metropolitan areas. And if the drastic and seldom used constitutional remedy offer at this late date no relief, may not the amendment provisions of the Constitution, and the proposed Court of the Union afford an effective means of re-establishing that delicate balance between *676 powers reserved to the States and those delegated to the Federal Government, so carefully worked out by our Founding Fathers, not only in the matter here presented of judicial frustration of crime prevention but in a goodly number of other matters of at least equal importance in the area of State-Federal relationship.
Lest this appear as too much ado about a button, may it be pointed out that much more than a button is here involved — it is the important subject of prearrest police crime prevention activity and judicial frustration thereof — important to metropolitan areas.
While ultimate solution of the problem may await legislative clarifying action, we find ourselves confronted with the problems of complying with the Mapp decision and applying the Federal case law of search and seizure to the facts of this particular case. But, alas, neither that body of. case law nor the Mapp opinions give us any guideposts or help; this problem of the propriety of prearrest crime prevention patrol has not been considered by any Federal decision with the possible exception of United States v. Bonanno (180 F. Supp. 71, 78; 285 F. 2d 408). Not only is there “ uncertainty ” in this body of Federal case law which we are mandated to apply, there is a near absolute vacuum, a vacant absence of authority or even guidepost to indicate what prearrest crime prevention patrol inquiry, investigation or brief detention is constitutionaly reasonable. Federal courts have had but limited occasion to consider searches in connection with crime prevention patrol duty. Federal enforcement agencies most usually do not search or arrest until after indictments are returned or until their investigations are nearly completed, and they never have, and probably never will, engage in police patrol crime prevention duties. Hence, the Federal judicial processes have not, prior to the Mapp decision, given Federal courts much opportunity to even consider this problem. But should all the valuable services rendered to the metropolitan community by crime prevention police patrol duty be judicially condemned1* without a full hearing or some consideration, as “poison”!’ “ Poison ” is precisely what the defendant’s attorney urges the button in this case is, because he insists the patrolman’s action of comparing this button is improper and indeed “poison”. “ Poison ” is what many read the Federal case law, as branding all crime prevention prearrest activity of metropolitan police!
Need it be pointed out that a police officer on crime prevention patrol duty, who may at any time come upon a situation requiring almost split-second decision and action, is placed, by this; state of the law, in a most difficult situation indeed. If we trial judges deciding these questions in the relative quiet and security- *677 of courtrooms, chambers, or libraries have difficulty and diversity in determining the propriety of what the police officers should have done, let it be borne in mind that the patrol officer must not only decide such questions but adopt a course of action and carry it out in far less time, in tension charged situations in which he may be in grave personal danger of physical violence and injury. In this friction-fraught area of human relationship in which the crime prevention and law-enforcement agencies of government reach out among the citizenry, whose duty it is to protect, to discover and apprehend the criminal, whose duty it is to punish, a very small seed of misunderstanding between the patrolman and the citizen as to respective rights and duties may suddenly grow out of all proportion into a vicious jungle in which all the courtesies and decencies of the human natures involved are extinguished, and only the violent, aggressive abusive elements of such human natures are brought into horrendous full play. If the law is to serve the needs of the people and aid us toward that better society we seek, this current uncertainty in this branch of the law must be replaced by a readily understood set of ground rules for this friction-fraught relationship.
In the absence of guideposts and in the hope of enlightenment and directions from a higher court or legislatures we have agreed and unanimously held that the actions of the patrolman in this case in interrogating the defendant, laying hold of the defendant’s arm and comparing the found button with the buttons remaining upon the sleeve of the defendant’s coat, and briefly detaining the defendant before the arrest was formally made, were reasonable — constitutionally reasonable and did not unreasonably violate any rights to privacy of this defendant. There was ample probable cause for this patrolman to believe that a whole series of crimes had been committed — joyride car theft (a felony, though in fact that crime had not) —as well as a goodly number of traffic misdemeanors and infractions. Since there was such probable cause, we agree the interrogation, investigation and brief detention of the defendant by the patrolman was not an abusive police practice and was not unreasonable in the light of the facts in this record. That this interrogation, investigation and detention produced evidence of the defendant’s connection with the accident and misdemeanors does not render such evidence “ poison ” and inadmissible, under the constitutional condemnation of “ unreasonable search and seizure ”. Accordingly, the motion of defense counsel to suppress the evidence relating to the button has been unanimously denied. Such evidence was received and considered in determining and resol *678 ving the remaining question in this ease, namely, does the circumstantial evidence herein sufficiently establish that the defendant was driving the ear at the time of the accident?
While we have unanimously agreed upon the much more difficult of the problems here presented, there is not the same unanimity as to whether this circumstantial evidence sufficiently establishes the defendant as the driver. We agree that the fact of this driving can be proved, like any other act, by sufficient circumstantial evidence. We also agree that the car had a driver and did not bring itself to the scene of the accident without any driver (some considerable distance from the places of residence of the defendant and the owner). We agree that the evidence connects the car quite closely to the defendant, and, most significantly, in spite of his denials of any such connection by driving or otherwise. We agree that the record places only the defendant in the general area of the accident (just under a block away) and there is no evidence of any other person in that area. We agree that the evidence places the defendant in the car and even in the front seat of the car. But does this evidence, including the button found on the driver’s seat, exclude every other possible reasonable hypothesis, but that the defendant was driving, and beyond reasonable doubt? For my part, this circumstantial and uncontroverted evidence meets this standard of proof, and I therefore dissent from the acquittal of the defendant.
Phipps, J., concurs with Bloom, J.; Creel, P. J., dissents in opinion.